**WO**

IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF ARIZONA

| | |
|---|---|
| Leena Lee,<br><br>　　　　　　Plaintiff,<br><br>vs.<br><br>United States Department of Homeland Security, et al.,<br><br>　　　　　　Defendant. | No. CV-21-00648-PHX-SPL<br><br>**FINDINGS OF FACT AND CONCLUSIONS OF LAW** |

　　　　On April 16, 2021, Plaintiff initiated this negligence action. (Doc. 1). In the operative First Amended Complaint for Damages, Plaintiff asserts a claim against Defendant the United States pursuant to the Federal Torts Claims Act 28 U.S.C. 2671, *et seq.* and 28 U.S.C. 1346(b)(1), for negligence by Andrew Swierski, an employee of the United States Immigration and Customs Enforcement. (Doc. 31 at ¶¶ 11–15). Plaintiff seeks general compensatory damages, incurred and future special damages for medical care, lost earnings or wages, out of pocket expenses, and court costs. (Doc. 31 at 4). Defendant timely filed an answer on September 8, 2021. (Doc. 35).

　　　　The Court has jurisdiction over this action pursuant to 28 U.S.C. § 1346(b)(1). (Doc. 31 at ¶ 8).

　　　　This action, having been tried before the Court on February 6, 2024 through February 7, 2024, and the Court having carefully considered the proposed findings of fact and conclusions of law (Docs. 77, 80), the Joint Proposed Pretrial Order (Doc. 79), the testimony received, and the exhibits admitted into evidence, hereby makes the following

Findings of Fact and Conclusions of Law, pursuant to Fed. R. Civ. P. ("Rule") 52(a) and LRCiv 52.1:

**FINDINGS OF FACT**

1. On October 24, 2019, Plaintiff Leena Lee was involved in a car collision with Andrew Swierski, an employee of United States Immigration and Customs Enforcement ("ICE"). (Trial Tr. Day 1 AM at 18:13–25; Trial Tr. Day 1 PM at 120:1–3).[1]

2. At all relevant times, Mr. Swierski was acting in the course and scope of his employment with the ICE. (Trial Tr. Day 1 AM at 18:20–23).

3. As part of his employment, Mr. Swierski received training regarding the safe operation of a motor vehicle and obtained his commercial driver's license. (Trial Tr. Day 1 AM at 22:11–23:5).

4. One of Mr. Swierski's responsibilities as an employee of ICE was to be attentive to the roadway as he operated his vehicle so that he could properly respond to any changes in roadway conditions that he may encounter. (Trial Tr. Day 1 AM at 23:22–24:7, 24:11–25:3, 26:17–24).

5. The accident occurred at the intersection of State Route ("SR") 87 and SR 187, in Pinal County, Arizona. (Trial Tr. Day 1 AM at 19:1–3; Exhibit 101, Certified Copy of Arizona Department of Public Safety Arizona Crash Report, "Ex. 101" at DPS000001).

6. On the day of the accident, Mr. Swierski reported to the Eloy Detention Center at approximately 3:00 a.m. to pick up documents and transport them to the Mesa Gateway Airport. (Trial Tr. Day 1 AM at 28:7–17).

---

[1] Citations to the trial transcripts refer to the transcripts by day. "Day 1 AM" refers to the transcript of the proceedings held the morning of February 6, 2024, reflected at Minute Entry 87. "Day 1 PM" refers to the transcript of the proceedings held during the afternoon on February 6, 2024, reflected at Minute Entry 88. "Day 2" refers to the transcript of the proceedings held on February 7, 2024, reflected at Minute Entry 89.

7. Shortly after Mr. Swierski arrived at the Eloy Detention Center, he got into a 2013 white Ford Explorer that was owned by the United States government. (Trial Tr. Day 1 AM at 30:13–31:1). The documents that Mr. Swierski needed to transport were already in the vehicle so once inside the vehicle Mr. Swierski headed directly to the Mesa Gateway Airport. (*Id.*).

8. Every time Mr. Swierski has traveled from the Eloy Detention Center to the Mesa Gateway Airport, he has traveled westbound on State Route 87, and he is very familiar with the route. (Trial Tr. Day 1 AM at 28:22–24, 38:13–20).

9. On October 23, 2019, the day before the accident, Plaintiff reported to her job at Frito-Lay in Casa Grande around 6:30 a.m. and stayed until approximately 8:00 p.m. (Trial Tr. Day 1 PM at 118:9–11, 120:16–19).

10. During Plaintiff's shift on October 23, 2019, Plaintiff worked approximately 14 hours and took breaks during the day. (Trial Tr. Day 1 PM at 120:16–21).

11. After Plaintiff's shift ended, she went "went home to take a nap" because she "didn't want to stay [at work] all night long" and because she wanted "to get some rest before [she] had to [return to work later that evening]." (Trial Tr. Day 1 PM at 120:22–121:2).

12. Plaintiff's usual route home from work included traveling along SR 187 and Plaintiff was aware that that there was a stop sign at the intersection of SR 187 and 87. (Trial Tr. Day 1 PM at 120:9–16, 121:3–12).

13. Plaintiff was driving a 2015 Nissan Sentra. (Trial Tr. Day 1 PM at 120:17–18).

14. Plaintiff's vehicle had automatic lights so when she started her car her headlights automatically turned on. (Trial Tr. Day 1 PM at 120:17–23).

15. On October 23, 2019, Plaintiff returned to work at Frito-Lay at approximately 11:00 p.m. to attend a training. (Trial Tr. Day 1 PM at 121:23–24).

16. Once the training was over, Plaintiff's workplace was starting to get "hectic." The warehouse was "jammed up," the "crane machines were down," and "the belts were clogged and needed to be fixed." (Trial Tr. Day 1 PM at 122:3–10).
17. "So [Plaintiff] stayed past the training in order to help alleviate those issues." (Trial Tr. Day 1 PM at 122:11–13).
18. Plaintiff worked approximately three or four hours and left her workplace on October 24, 2019, between 2:00 a.m. and 3:00 a.m. (Trial Tr. Day 1 PM at 122:14–18).
19. Plaintiff worked approximately seventeen to eighteen hours between the evening of October 23, 2019, and the early morning of October 24, 2019. (Trial Tr. Day 1 PM at 142:8–19).
20. Plaintiff remembers "feeling awake" and "very clearheaded" as she was leaving her workplace. (Trial Tr. Day 1 PM at 122:21–25).
21. Plaintiff's last memory prior to the accident is seeing her headlights flash against the gate as she was leaving her workplace. (Trial Tr. Day 1 PM at 123:1–8, 142:20–143:1).
22. Plaintiff has no memory between leaving her workplace and waking up in the hospital. (Trial Tr. Day 1 PM at 123:1–8, 141:21–142:4, 142:20–143:1).
23. Plaintiff was wearing a seatbelt at the time of the accident. (Ex. 101 at DPS000001).
24. Mr. Swierski was wearing a seatbelt at the time of the accident. (*Id.*).
25. The speed limit on SR 87 was 65 miles per hour (Trial Tr. Day 1 AM at 12:21–7; Ex. 101 at DPS000001).
26. While traveling westbound on SR 87, Mr. Swierski set the cruise control to 65 miles per hour. (Trial Tr. Day 1 AM at 31:5–22).
27. Mr. Swierski's vehicle's headlights were turned on. (Trial Tr. Day 1 AM at 32:14–15).
28. The accident happened at approximately 3:50 a.m. on a clear dark night in the open desert. (Trial Tr. Day 1 AM at 32:8–9; Trial Tr. Day 1 PM at 143:5–7).

29. There were no obstructions to Mr. Swierski's visibility as he approached the intersection of SR 87 and SR 187. (Trial Tr. Day 1 AM at 28:25–29:3, 32:16–21).
30. During the moments leading up to the accident, Mr. Swierski testified that he had no distractions. (Trial Tr. Day 1 AM at 31:25–32:7, 38:23–40:3).
31. During the moments leading up to the accident, Mr. Swierski testified that he was alert and attentive and paying attention to his surroundings. (Trial Tr. Day 1 AM at 43:21–44:11).
32. Mr. Swierski did not have a stop sign at the intersection of SR 87 and SR 187. (Trial Tr. Day 1 AM at 38:18–22).
33. While driving northbound on SR 187, Plaintiff approached a stop sign at the intersection of SR 187 and SR 87. (Trial Tr. Day 1 AM at 96:5–8; Trial Tr. Day 1 PM at 119:14–16, 123:9–11).
34. There were no obstructions to Plaintiff's visibility of Mr. Swierski's vehicle or the stop sign as she approached the intersection at SR 187 and SR 87. (Trial Tr. Day 1 AM at 102:13–103:4).
35. Plaintiff does not recall if she stopped at the stop sign at the intersection of SR 187 and SR 87. (Trial Tr. Day 1 PM at 141:24–142:1).
36. Plaintiff does not recall if she was turning left when she entered the intersection of SR 187 and 87. (Trial Tr. Day 1 PM at 142:2–4).
37. Both vehicles were continuing in their straight lanes of traffic at impact. (Trial Tr. Day 1 AM at 99:21–24; Trial Tr. Day 1 PM at 167:14–18, 171:1–5, 171:10–13, 207:14–17).
38. Plaintiff's vehicle was moving and not stationary. (Trial Tr. Day 1 PM at 169:25–170:16).
39. Plaintiff's vehicle was traveling at least 25 miles per hour at impact. (Trial Tr. Day 1 AM at 72:4–9, 74:4–8; Trial Tr. Day 1 PM at 175:1–2).

40. Mr. Swierski's vehicle was traveling approximately 65 miles per hour at impact. (Trial Tr. Day 1 AM at 95:24–96:4; Trial Tr. Day 1 PM at 174:14–23).

41. Mr. Swierski never saw Plaintiff's vehicle. (Trial Tr. Day 1 AM at 32:22–33:9, 44:15–18, 47:8–12).

42. At his deposition, Mr. Swierski testified that he does not recall whether he ever saw Plaintiff's headlights as she was approaching the intersection. (Trial Tr. Day 1 AM at 41:19–42:11).

43. Mr. Swierski testified that he "remember[s] seeing [the headlights] out of the corner of [his] eye right before impact." (*Id.*). He estimated that it was "[a] split second before impact." (*Id.*).

44. At trial, Mr. Swierski testified that he does not recall whether he saw Plaintiff's headlights prior to reaching the intersection. (Trial Tr. Day 1 AM at 40:11–14, 44:15–18).

45. Mr. Swierski further testified that he recalls seeing Plaintiff's headlights out of his peripheral vision "just a second or two before impact." (Trial Tr. Day 1 AM at 40:4–10).

46. When describing the moments leading up to the accident, Mr. Swierski provided the following testimony:
> I was just driving straight, the cruise control, looking ahead. There are a few highways that run across from I-10. There are always vehicles that are coming down. They have to stop at a stop sign. On that particular night, I saw headlights coming, and then just at the last minute I realized that the headlights weren't -- the vehicle wasn't going to stop, and I realized that there was going to be a collision between the two vehicles. It all happened within a matter of a couple of seconds.

(Trial Tr. Day 1 AM at 41:5–18).

47. Plaintiff is unable to describe the moments leading up to the collision because she has no recollection of the accident. (Trial Tr. Day 1 PM at 137:13–17, 141:21–23).

48. The front end of Mr. Swierski's Ford Explorer collided with the right side of Plaintiff's Nissan Sentra at the intersection of SR 87 and SR 187. (Trial Tr. Day 1 PM at 169:25–170:16).
49. No witnesses have testified that Plaintiff stopped at the stop sign at the intersection of SR 87 and SR 187.
50. No witnesses have provided statements regarding the accident at issue in this case.
51. At trial, Plaintiff offered testimony from Timothy Pebler, an accident reconstructionist. (Trial Tr. Day 1 AM at 49:8–24).
52. Mr. Pebler concluded that upon impact Mr. Swierski was traveling 65 miles per hour and Plaintiff was traveling 25 miles per hour. (Trial Tr. Day 1 AM at 71:23–72:9).
53. Mr. Pebler also concluded that the maximum acceleration rate for Plaintiff's vehicle was .4 G and when the vehicles collided Plaintiff was traveling at a .35 G acceleration rate. (Trial Tr. Day 1 AM at 75:10–21, 103:16–17).
54. Mr. Pebler agrees that he has seen nothing in this case to indicate that Plaintiff stopped at the stop sign. (Trial Tr. Day 1 AM at 96:5–8, 96:17–20, 98:1–5).
55. Nevertheless, Mr. Pebler concluded that Plaintiff stopped at the stop sign because "the acceleration rate of her vehicle and the distance she traveled to the area of impact [] was well within the capabilities of [her] Nissan Sentra." (Trial Tr. Day 1 AM at 76:13–16).
56. Mr. Pebler agrees that based on this conclusion "[Plaintiff] would have almost floored her car in front of oncoming traffic." (Trial Tr. Day 1 AM at 103:10–104:1).
57. Mr. Pebler opined that Plaintiff's vehicle accelerated from the stop sign on 187 to the area of impact within 3.25 seconds. (Trial Tr. Day 1 AM at 77:2–11).
58. Mr. Pebler also performed a time distance analysis for Mr. Swierski's vehicle and concluded that Mr. Swierski was "approximately 310 feet to the southeast of the area of impact when [Plaintiff] first started to accelerate onto State Route 87." (*Id.*).

59. Ultimately, Mr. Pebler opined that Mr. Swierski should have seen Plaintiff prior to the collision. (Trial Tr. Day 1 AM at 77:12–78:6). Therefore, Mr. Pebler concluded that Mr. Swierski was distracted because "[t]here was no preimpact deceleration or anything that occurred prior to impact and [Mr. Swierski] had 3.25 seconds to be able to see what was going on [] directly ahead of him.  And he never took any evasive action." (Trial Tr. Day 1 AM at 79:8–18).
60. Mr. Pebler's opinion is based solely on the assumption that Plaintiff stopped at the stop sign. (Trial Tr. Day 1 AM at 99:16–20). Mr. Pebler agrees, however, that Mr. Swierski would not have had 3.25 seconds to see and appreciate Plaintiff's vehicle continuing through the intersection if Plaintiff failed to stop and drove a consistent 25 miles per hour through the intersection. (Trial Tr. Day 1 AM at 98:20–99:15).
61. At trial, Defendant offered testimony from expert, Timothy S. Leggett, an accident reconstruction engineer and a professional mechanical engineer. (Trial Tr. Day 1 PM at 156:10–24).
62.  Mr. Leggett concluded that at impact Mr. Swierski was traveling between 65 and 71 miles per hour and Plaintiff was traveling between 33 and 40 miles per hour. (Trial Tr. Day 1 PM at 174:14–175:2).
63. Mr. Leggett concluded that because the damage to the front end of the Ford Explorer had a lateral shift to the right, Plaintiff could not have been traveling any slower than 33 miles per hour. (Trial Tr. Day 1 PM at 169:19–170:16, 176:1–15).
64. Mr. Leggett further concluded that to have stopped at the stop sign and accelerate up to 33 to 40 miles per hour upon impact, Plaintiff's vehicle would have accelerated at a rate of approximately .5 G or .6 G. (Trial Tr. Day 1 PM at 177:25–178:10).
65. Mr. Leggett testified that the maximum acceleration rate for a brand-new Nissan is .4 G. (Trial Tr. Day 1 PM at 177:18–23, 178:15–22). However, because Plaintiff's Nissan Sentra was a little older, Mr. Leggett concluded that maximum acceleration for Plaintiff's vehicle was approximately .35 G. (Trial Tr. Day 1 PM at 178:15–22).

66. Thus, Mr. Leggett concluded that it is not possible that Plaintiff stopped at the stop sign because she would have needed to accelerate at "almost double the acceleration capabilities of the vehicle." (Trial Tr. Day 1 PM at 177:25–178:10).
67. Mr. Leggett assumed that Plaintiff was traveling at a constant speed between 33 and 40 miles per hour and opined that Plaintiff traveled from the stop sign to the intersection in approximately 1.2 to 1.4 seconds. (Trial Tr. Day 1 PM at 180:2–21).
68. Mr. Leggett explained that perception-response time is about 1.9 seconds, and it is "the time that it takes the officer to perceive the threat and realize that there's a hazard presenting, and at that point, then he gets to decide what he's going to do about it, whether he's going to swerve, brake, or both." (Trial Tr. Day 1 PM at 179:9–25).
69. Ultimately, Mr. Leggett concluded that this accident was unavoidable because "the time provided by the plaintiff Nissan was 1.2 to 1.4 seconds, so it was less than the time that [Mr. Swierski] needed to perceive." (Trial Tr. Day 1 PM at 179:9–24, 181:19–182:4).
70. Mr. Pebler's conclusion did not consider any perception response time. (Trial Tr. Day 1 AM at 100:18–20).
71. Mr. Pebler and Mr. Leggett both used PC-Crash to reach their opinions. (Trial Tr. Day 1 AM at 63:16–21; Trial Tr. Day 1 PM at 171:16–24).
72. Despite reaching different conclusions regarding the measurements, the speed of Plaintiff's vehicle, and whether she stopped at the stop sign, Mr. Pebler and Mr. Leggett both agreed that Plaintiff sped into oncoming traffic. (Trial Tr. Day 1 AM at 103:10–104:1; *see* Trial Tr. Day 1 PM at 176:1–15, 178:15–22).
73. The Court finds that Mr. Pebler's conclusion that Plaintiff stopped at the stop sign and then proceeded to accelerate into oncoming traffic at the vehicle's maximum capacity is unpersuasive. (Trial Tr. Day 1 AM at 76:10–16).

74. The evidence presented at trial supports a finding that Plaintiff failed to stop at the sign and failed yield to oncoming traffic upon approaching the intersection of SR 87 and 187.

75. The evidence presented at trial supports a finding that Mr. Swierski kept a proper lookout ahead, however, because Plaintiff failed to stop at the stop sign and yield to oncoming traffic, Mr. Swierski did not have enough time to perceive the impact and take action to avoid the collision. (Trial Tr. Day 1 AM at 99:4–9; Trial Tr. Day 1 PM at 179:9–24, 181:19–4, 185:22–186:3).

76. The Ford Explorer driven by Mr. Swierski sustained heavy damage including damage to the front end across the full width of its front bumper, the front bumper was displaced rearward and to the right, the front axle was displaced rearward, the hood was buckled rearward, and the leading edges of the front fenders were crushed rearward. (Trial Tr. Day 1 AM at 61:24–62:2; Trial Tr. Day 1 PM at 169:25–170:16; Trial Tr. Day 2 at 259:18–260:5; Exhibit 1, Police Photos "Ex. 1"; Exhibit 102, Accident Pictures, "Ex. 102").

77. Ms. Lee was driving the Nissan Sentra and it sustained a T-bone style impact with heavy damage to the right-side and damage to the rear bumper due to contact with the stop sign and utility markers as it traveled off the roadway. (Trial Tr. Day 1 AM at 61:14–22; Trial Tr. Day 1 PM at 170:20–25, 200:4–13; Ex. 1; Ex. 102).

78. Plaintiff was transported by Gila River Emergency Medical Services to Chandler Regional Medical Center. She was diagnosed with facial lacerations and multiple fractures, including lower vertebral, pelvic and sacral. She underwent surgery with placement of hardware. She also had a right nonoperative scapula fracture. (Trial Tr. Day 1 PM at 125:23–126:6, 128:7–11).

79. Plaintiff spent approximately one week in the hospital and two months in a skilled nursing facility while she recovered from her injuries. (Trial Tr. Day 1 PM at 126:15–16, 128:19–21).

**CONCLUSIONS OF LAW**

80. Plaintiff brings this action pursuant to the Federal Tort Claims Act ("FTCA"), 28 U.S.C. § 2671, *et seq*.

81. This Court has subject matter jurisdiction pursuant to 28 U.S.C. § 1346(b). Venue is proper in this District pursuant to 28 U.S.C. § 1402(b).

82. The FTCA waives the United States' sovereign immunity "for injury or loss of property . . . caused by the negligent or wrongful act or omission of any employee of the Government while acting within the scope of his office or employment, under circumstances where the United States, if a private person, would be liable to the claimant in accordance with the law of the place where the act or omission occurred." 28 U.S.C. § 1346(b)(1).

83. The accident giving rise to this action occurred in Arizona and therefore Arizona substantive law controls. *See Richards v. United States*, 369 U.S. 1, 8-10 (1962); *see Louie v. United States*, 776 F.2d 819, 824 (9th Cir. 1985); *see* 28 U.S.C. § 1346(b)(1).

84. To establish a claim for negligence, a plaintiff must prove four elements: (i) a duty requiring the defendant to conform to a certain standard of care; (ii) a breach by the defendant of that standard; (iii) a causal connection between the defendant's conduct and the resulting injury; and (iv) actual damages. *Gipson v. Kasey*, 150 P.3d 228, 230 (Ariz 2007) (citing *Ontiveros v. Borak*, 667 P.2d 200, 204 (Ariz. 1983)).

85. "Duty is defined as an obligation, recognized by law, which requires the defendant to conform to a particular standard of conduct in order to protect others against unreasonable risks of harm." *Gipson*, 150 P.3d at 230 (quotation omitted).

86. In Arizona, "a driver having the right of way . . . is still under an obligation to make that degree of observation as a reasonably prudent person would have made under such conditions." *Henderson v. Breesman*, 269 P.2d 1059, 1063 (Ariz. 1954); *see also Rudolph v. Ariz. B.A.S.S. Fed'n*, 898 P.2d 1000, 1003 (Ariz. App. 1995) ("[E]very driver on the public highways owes to all other users of the highways a duty to drive carefully so as not to subject them to unreasonable risks of harm."

(citation omitted)).

87. Therefore, a driver traveling on a favored highway with the right-of-way must "keep[] a proper lookout and yield[] the right-of-way, where he can, to another motorist when the favored driver discovers that the other is not going to yield." *Davis v. Weber*, 380 P.2d 608, 612 (Ariz. 1963) (citations omitted).

88. However, "[t]he purpose of facilitating traffic on favored highways would be completely frustrated if travelers upon them were required to slow down at every intersecting highway." *Nichols v. City of Phoenix*, 202 P.2d 201, 205–06 (Ariz. 1949); *see also Rogers v. Retrum*, 825 P.2d 20, 23 (Ariz. Ct. App. 1991) ("A jury will not be permitted to require a party to take a precaution that is clearly unreasonable. . . . Thus, for example, the jury may not require a train to stop before passing over each grade crossing in the country.") (quotations and citation omitted).

89. Thus, "[a] driver of a motor vehicle is not under a duty to anticipate, in the absence of evidence, that other drivers will cross into traffic negligently in violation of the [] law." *Davis*, 380 P.2d at 608 (citation omitted).

90. Plaintiff failed to meet her burden of showing that there is evidence to support that Mr. Swierski should have anticipated that she would violate traffic laws and not yield him the right of way.

91. Mr. Swierski had a duty to keep a proper lookout and yield the right-of-way to Ms. Lee if he discovered that she was not going to yield. *See Davis v. Weber*, 380 P.2d at 612. Mr. Swierski adhered to the speed limit, was attentive to his surroundings, and had no distractions. However, Mr. Swierski could not have anticipated that Ms. Lee would not yield him the right of way. Thus, Mr. Swierski did not breach this duty. Moreover, because Mr. Swierski had no knowledge of an upcoming hazard, Mr. Swierski's failure to take additional caution by slowing down his vehicle prior to reaching the intersection is also not a breach of duty. *See Nichols*, 202 P.2d at 205–06 (finding that the defendants were wholly within their rights in assuming that the other driver would stop prior to reaching the intersection).

92. The evidence in this case supports that Plaintiff was traveling at least 25 miles per hour straight through the intersection without yielding to oncoming traffic. Because Plaintiff was traveling at this speed without slowing down or yielding, Mr. Swierski did not have enough time to perceive her vehicle and take action to avoid impact.

93. Likewise, despite having an unobstructed view of the road, Mr. Swierski did not have enough time to anticipate that Plaintiff would not adhere to traffic laws. *See Davis*, 380 P.2d at 608 ("[S]till there is no evidence whatsoever upon which to predicate an assumption that [the defendant] could have anticipated or foreseen that [the plaintiff] would not or could not stop.").

94. Thus, the Court finds that the record sufficiently shows that Mr. Swierski acted prudently and without negligence, and therefore, cannot be held liable for Plaintiff's injuries. *See Sheehy v. Murphy*, 380 P.2d 152, 154 (Ariz. 1963) ("In view of these circumstances the record does not disclose any negligence on the part of the defendant up to the time he first saw the plaintiff.").

Dated this 22nd day of February, 2024.

Honorable Steven P. Logan
United States District Judge